**Electronically Filed
Supreme Court
SCAP-19-0000714
10-FEB-2023
08:52 AM
Dkt. 15 OP**

IN THE SUPREME COURT OF THE STATE OF HAWAIʻI

---o0o---

STATE OF HAWAIʻI,
Plaintiff-Appellee,

vs.

DAE HAN MOON,
Defendant-Appellant.

SCAP-19-0000714

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CAAP-19-0000714; CASE NO. 1PC161002007)

FEBRUARY 10, 2023

RECKTENWALD, C.J., NAKAYAMA, McKENNA, AND EDDINS, JJ.,
AND WILSON, J., DISSENTING

OPINION OF THE COURT BY RECKTENWALD, C.J.

### I. INTRODUCTION

This case considers the application of Hawaiʻi Revised Statutes (HRS) § 327C-1 (2010), which defines the process for making "death determinations in the State" in all "civil and criminal actions." HRS § 327C-1(d).

On December 25, 2016, Dae Han Moon allegedly shot Steve Feliciano in the head during an altercation. During a grand jury proceeding on December 29, 2016, the Chief Medical Examiner of the City and County of Honolulu testified that the day prior, a doctor had pronounced Feliciano brain dead, and that the cause of his death was a gunshot wound to the head. Because Feliciano was an organ donor, he was "being kept alive artificially." The grand jury indicted Moon on four counts, including Murder in the Second Degree.

Subsequently, Feliciano's organs and tissues were removed, and an autopsy was performed. The case proceeded to a jury trial in the Circuit Court of the First Circuit, where several witnesses testified to seeing Moon shoot Feliciano. The First Deputy Medical Examiner, who performed Feliciano's autopsy, testified that the cause of Feliciano's death was a gunshot wound to the head. The jury found Moon guilty on all counts.

Moon argues that the requirements of HRS § 327C-1 apply to all criminal cases involving death, including his case. Thus, the State needed to fulfill these requirements to prove the element of "death." We disagree. Based on its plain language and legislative history, this statute applies in cases where a "death determination" – that is, where a "generally medically recognized criteria of determining the occurrence of

2

death" – is required or implicated.  Christine Mukai et al.,

Legis. Reference Bureau, Towards a Definition of Death 14 (1977)

[hereinafter LRB Report], https://lrb.hawaii.gov/wp-

content/uploads/1977TowardsADefinitionOfDeath.pdf.  In contrast,

there was ample evidence introduced at trial that Feliciano died

as a result of a gunshot wound to the head.  As such, there was

no need for a "determination of death" within the meaning of HRS

§ 327C-1.  Accordingly, we affirm the circuit court's Amended

Judgment of Conviction and Sentence.[1]

## II.  BACKGROUND

### A.    Factual Background

The following facts are undisputed on appeal.  On

December 25, 2016, Moon shot Feliciano once in the back of the

head at close range with a pistol.  The shooting occurred in the

Ala Moana Shopping Center parking structure.  Following the

shooting, paramedics transported Feliciano to Queen's Medical

Center (QMC) in critical condition.  There, Dr. Kazuma Nakagawa

pronounced Feliciano brain dead at 5:49 p.m. on December 28,

2016.  The next day, a grand jury indicted Moon on four counts:

Murder in the Second Degree in violation of HRS §§ 707-701.5

(2014)[2] and 706-656 (2014)[3] (Count 1); Place to Keep Pistol or

---

[1]     Moon also asks that we reverse his convictions on five other
grounds.  As discussed below, these arguments lack merit.

[2]     HRS § 707-701.5 states:

(. . . continued)

3

Revolver in violation of HRS § 134-25 (2011) (Count 2); Carrying or Use of Firearm in the Commission of a Separate Felony in violation of HRS § 134-21 (2011) (Count 3); and Ownership or Possession Prohibited of Any Firearm or Ammunition by a Person Bound Over to Circuit Court for Certain Crimes in violation of HRS § 134-7(b) and (h) (2011) (Count 4). Feliciano's organs and tissues were removed on December 30, 2016. On January 3, 2017, an autopsy was performed. The case subsequently proceeded to a

---

(. . . continued)

> (1) Except as provided in section 707-701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
> (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706-656.

[3]    HRS § 706-656(2) states:

> Except as provided in section 706-657, pertaining to enhanced sentence for second degree murder, persons convicted of second degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawai'i paroling authority; provided that persons who are repeat offenders under section 706-606.5 shall serve at least the applicable mandatory minimum term of imprisonment.
> If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706-657, as part of that sentence, the court shall order the director of public safety and the Hawai'i paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706-606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

jury trial, and the jury found Moon guilty as charged on all four counts.

**B.    Grand Jury Proceedings**

At the grand jury proceedings four days after the shooting, the State called Dr. Christopher Happy, the Chief Medical Examiner for the City and County of Honolulu, to testify before the grand jury.  Dr. Happy testified that he reviewed Feliciano's medical records and photographs of Feliciano in the hospital; he also spoke to investigating officers about the events surrounding Feliciano's death.  In examining this information, Dr. Happy observed "a gunshot wound in the back of [Feliciano's] head with fragments of a bullet lodged in the head."  He testified that the gunshot wound to the head was the cause of Feliciano's death, and the manner of death, a homicide. According to Dr. Happy, the date of Feliciano's death was December 28, 2016 at 5:49 p.m.  Dr. Happy explained that Feliciano had "been declared brain dead" at that time based on an "evaluation by a neurologist who has found that he has no function left in his brain."  Since Feliciano was an organ donor, he was being kept alive artificially so that his organs could be donated.  Consequently, an autopsy had yet to be conducted.

C.    Circuit Court Proceedings[4]

1.    Trial Proceedings

At trial, various witnesses testified that Moon and Feliciano were involved in an altercation at the Ala Moana Center parking structure on December 25, 2016.  During this altercation, Moon shot Feliciano in the head.[5]  After the incident, police and paramedics arrived at the scene.  Ruddy Hernandez, a paramedic for the City and County of Honolulu, testified that, upon their arrival, Feliciano was "pulseless and apneic, unresponsive," meaning that he "had no activity of his heart and he wasn't breathing."  The paramedics performed CPR, and Feliciano was able to regain a "return of spontaneous circulation" or "ROSC," such that "his blood pressure, his heart rate and his heart started to conduct a pulse."  At that point, Feliciano was "in a critical state"; he was "hypotensive," meaning that "his blood pressure was really low."  Paramedics were able to maintain ROSC, but Feliciano remained in critical condition when he arrived at QMC.

Christopher Inoue, a medical-legal investigator for the Department of the Medical Examiner for the City and County

_____

[4]    The Honorable Karen T. Nakasone presided.

[5]    Several witnesses also testified that, prior to shooting Feliciano, Moon hit Feliciano on the head with a gun.  After Moon shot Feliciano, Feliciano fell to the ground.

of Honolulu, testified that Dr. Nakagawa pronounced Feliciano dead on December 28, 2016 at 5:49 p.m.[6]  At 7:35 p.m. that same day, Inoue saw Feliciano's body on a hospital gurney.  Inoue observed various signs of "medical intervention":

> He was intubated and connected to a ventilator.  There were EKG leads on his chest and abdomen.  There was a cervical collar and a Foley catheter.  There was also a pulse oximeter and a blood pressure cuff and he had intravascular lines on his bilateral arms and left femoral area.

Charlotte Carter, another medical-legal investigator, testified that Feliciano was subsequently kept on a ventilator for the tissue and organ transplantation.  The ventilator "kept his heart beating and his circulation going[;]" without it, his tissues would have started to die.  At 9:50 p.m. on December 30, 2016, Carter received a notification from Legacy of Life, an organ procurement organization, that they were close to completing the organ and tissue recovery from Feliciano.  When she arrived, Feliciano was "well removed from the ventilator" as his organ recovery had been "[e]ffectively" completed.  Afterwards, Feliciano's remains were transported to the Honolulu Medical Examiner Facility.

Dr. Masahiko Kobayashi, the First Deputy Medical Examiner, testified as an expert in the field of forensic

---

[6]     Moon objected, arguing that Inoue's testimony was hearsay.  In response, the court gave a limiting instruction to the jury that Inoue's out-of-court statements "must not be considered for the truth . . . of those statements but, rather, for the limited purpose of showing the steps in the investigation."

pathology.  Before conducting an autopsy, Dr. Kobayashi reviewed the report prepared by Inoue and some of Feliciano's medical records.  Dr. Kobayashi testified that Feliciano was pronounced dead at QMC on December 28, 2016 at 5:49 p.m.  Since he was an organ donor, he was kept on a ventilator to ensure that "his heart was beating and his blood was circulating" so that his tissues would not die.

On January 3, 2017, Dr. Kobayashi performed an autopsy on Feliciano.  In addition to other injuries, he testified that Feliciano had a gunshot wound on the back-left side of his head.[7] This wound caused "widespread . . . bleeding inside the scalp tissue over the skull" and was a "[c]ontact gunshot wound," meaning that "a muzzle of the gun [was] in contact with the skin or nearly in contact."  Based on his findings and training and experience, Dr. Kobayashi testified that the cause of Feliciano's death was "a gunshot wound of the head."  "[T]he bullet entered from the back area of the head and then travelled towards the front, towards the forehead or brow area."  The bullet itself did not hit the brain stem; the latter "was subsequently injured but not at the time of [the] gunshot wound."

_____

[7]     Dr. Kobayashi also testified that Feliciano had a skin lesion and bruise on the left side of his head consistent with being struck with a hard object and a skull fracture consistent with falling unabated to a concrete surface.

After the State rested, Moon made a motion for judgment of acquittal, arguing that the State needed to comply with the requirements of HRS § 327C-1[8] to prove that Feliciano was dead as a matter of law – specifically, that he was brain dead before his organs were removed.  The State contended that HRS § 327C-1 was inapplicable and that, based on the evidence presented, there was no question that Feliciano was dead.  The circuit court denied the motion, stating,

> For the reasons set forth in the prosecution's written memorandum and the evidence in the record, judgment of acquittal, the court views the evidence in the light most favorable to the State.  I don't agree with the defendant's characterization of [HRS § 327C-1] and the requirement that is in that statute would sort of trump all the evidence in this case which is undisputed that Mr. Feliciano was -- he -- that the death in this case was undisputed looking at the totality of the evidence.

Moon renewed the motion after the defense rested and after the jury's verdict was rendered; the circuit court denied both renewed motions.[9]

---

[8]     For the text of HRS § 327C-1, see infra note 19.

[9]     Moon also requested the following jury instruction on brain death, which tracks the language of HRS § 327C-1:

> Before you can find that the defendant caused the death of Steve Feliciano, you must first determine that Steve Feliciano was pronounced brain dead.  Brain death will have occurred if all four of the following facts have been proved beyond a reasonable doubt . . . : Number 1.  In the opinion of an attending physician or osteopathic physician licensed in the state of Hawai'i, . . . or [excepted] from licensure by State law, . . . based on ordinary standards of current medical practice . . . ; and, Number 2, [i]n the opinion of a consulting physician or osteopathic physician licensed in the state of Hawai'i, . . . or [excepted] from licensure by State law, . . . based on ordinary standards of current medical practice . . . ; and, 3, [t]hese doctors
> (. . . continued)

2.   **Verdict and Sentence**

The jury found Moon guilty as charged on all four counts.  At sentencing, the circuit court dismissed Count 4.[10] Moon was then sentenced as follows: for Count 1, life imprisonment with the possibility of parole and a fifteen-year mandatory minimum term of imprisonment under HRS § 706-660.1 (2014); for Count 2, ten years of imprisonment; and for Count 3, twenty years of imprisonment.  All terms of imprisonment were to run concurrently, with credit for time served.

3.   **Motion for Arrest of Judgment**

Nine days after the verdict was rendered, Moon filed a motion for arrest of judgment and dismissal of Count 1 (Murder in the Second Degree) and Count 3 (Carrying or Use of Firearm in the Commission of a Separate Felony) pursuant to Hawai'i Rules of

---

(. . . continued)

> or osteopathic physicians have determined that Steve Feliciano had experienced irreversible cessation of all functions of the entire brain, . . . including the brain stem . . . ; and, Number 4, [t]hese opinions are made in signed statements.

> The circuit court denied the instruction over Moon's objection.

[10]    The State initially requested to dismiss Count 2 under the doctrine of merger and based on the State's decision to only proceed with sentencing on Count 4, but based on a correction to Moon's Presentence Investigation and Report, the State changed its request, asking to dismiss Count 4 and proceed with Count 2.  The circuit court granted this request and issued an Amended Judgment of Conviction and Sentence.

Penal Procedure (HRPP) Rule 34 (effective January 1, 1977).[11]  Moon argued that the circuit court "lack[ed] jurisdiction" over his case because, inter alia,[12] "the State failed to show at the grand jury proceeding that Feliciano had been determined to be brain dead."  According to Moon, the plain language, stated purpose, and legislative history[13] of HRS § 327C-1 "mandate[]" its application to "[a]ll death determinations in the State" for "all purposes, including . . . criminal actions."  (Second alteration in original.)  A grand jury indicting a defendant for Murder in the Second Degree, of which death is an element, was such a criminal action.

---

[11]    HRPP Rule 34 states:

> The court on motion of a defendant shall arrest judgment if the charge does not allege an offense or if the court was without jurisdiction of the offense alleged.  The motion in arrest of judgment shall be made within 10 days after verdict or finding of guilty, or after plea of guilty or nolo contendere, or within such further time as the court may fix during the 10-day period.  The finding of guilty or nolo contendere may be entered in writing or orally on the record.

[12]    In his motion for arrest of judgment, Moon also contended that the circuit court lacked jurisdiction over his case because Dr. Happy's testimony before the grand jury was "inaccurate"; the State "deliberate[ly] and intentional[ly]" used hearsay during the proceedings; and Moon's right to a fair and impartial grand jury proceeding had been violated, thus prejudicing Moon.

[13]    Specifically, Moon pointed to the LRB Report on changing definitions of death, to assert that the legislature enacted HRS § 327C-1 in 1978 with the intent of "codify[ing] the emerging concept of brain death . . . in order to avoid confusion and inconsistencies between the practice of medicine and the practice of law."  Moon argued, accordingly, that "this case presents the exact situation that lead [sic] to the passage of HRS § 327C-1 because Feliciano hovered between life and death for several days": the State convened a grand jury after Feliciano was declared brain dead but before the removal of his organs, at which point "it was most critical to determine whether Feliciano was legally 'brain dead.'"

Moon argued that the State failed to meet the statute's requirements to prove Feliciano's death in the grand jury by neglecting to present "direct testimony of two doctors who had signed statements declaring that Feliciano was brain dead because he experienced the cessation of all brain activity, including the brain stem." Moon contended that "Feliciano was still alive on December 29, 2016 – a fact that would have precluded a murder indictment," and thus, the State failed to establish probable cause. Since a defective indictment "negates the Court's jurisdiction," Moon contended that the court must dismiss Counts 1 and 3 against Moon.

The circuit court disagreed, concluding that "[a]n analysis of the plain . . . language of the relevant statutes and examination of the pertinent legislative history compel the conclusion that the definition of death in HRS Chapter 327C does not apply to criminal prosecutions brought under the [Hawai'i Penal Code (HPC)]." As relevant here, the circuit court found in its findings of fact that "[n]o evidence has been presented to contradict Dr. Kobayashi's opinion concerning the cause of Feliciano's death. There has been no suggestion that the withdrawal of life support or organ donation was an intervening cause of Feliciano's death."

In its conclusions of law, the circuit court explained that HRS § 327C-1, in its original and amended forms, does not reference the HPC or indicate a legislative intent to import HRS § 327C-1's determination of death requirements to prosecutions of criminal offenses codified in the HPC.  Likewise, the HPC neither defines death nor references the determination of death requirements in HRS § 327C-1.  Of particular relevance, HRS § 707-700 (2014), which defines terms for offenses including Murder in the Second Degree, in its original and amended forms, does not define death or reference HRS § 327C-1.

The circuit court noted that had the legislature intended to incorporate HRS § 327C-1's requirements into the HPC, it could have done so, citing various HPC provisions that explicitly reference the definition of terms in other statutes.[14] Based on the "legislature's inaction," the circuit court concluded that the legislature did not intend that HRS § 327C-1 apply to all "criminal actions brought under the [HPC] where 'death' constitutes the result element of the offense."

Since the HPC does not define "death," the circuit court gave the term its "ordinary meaning."  Quoting Black's Law

_____

[14] The circuit court cited HRS § 707-700 ("'Street' shall have the same meaning as in section 291C-1."; "'Vehicle' has the same meaning as in section 291E-1."); and HRS § 706-660.1 ("'Automatic firearm' has the same meaning defined in section 134-1."; "'Firearm' has the same meaning defined in section 134-1 except that it does not include 'semiautomatic firearm' or 'automatic firearm.'").

13

Dictionary, the circuit court defined death as "[t]he ending of life; the cessation of all vital functions and signs." Death, Black's Law Dictionary (10th ed. 2014); Death, Black's Law Dictionary (7th ed. 1999). Under this ordinary meaning of death, Dr. Happy's expert testimony before the grand jury provided a sufficient evidentiary basis for death.

Furthermore, the circuit court noted that Moon's interpretation of HRS § 327C-1 would lead to absurd results as it "would effectively prevent the prosecution of murders in this jurisdiction" where a dead body was not recovered. Without a body, it would be impossible to show that a person "experienced irreversible cessation of spontaneous respiratory and circulatory functions" as required in HRS § 327C-1(a).

The circuit court also concluded that it had jurisdiction over this case. It explained that Count 1 alleges a violation of HRS § 707-701.5, which is a cognizable criminal offense under the HPC. Additionally, the Indictment properly alleged that Moon's offense occurred in the City and County of Honolulu, which is within the jurisdiction of the circuit court.

In any event, the circuit court held that Moon's motion "falls within the definition of a pretrial motion as set forth in HRPP Rule 12(b)(2)." "Such motions must be brought

<u>prior</u> to trial," and Moon's failure to file such a motion before trial "waive[d] . . . that defense or objection." (Quoting <u>State v. Markowski</u>, 88 Hawai'i 477, 485, 967 P.2d 674, 682 (App. 1998)). In the alternative, pursuant to <u>In re Doe</u>, 102 Hawai'i 75, 78, 73 P.3d 29, 32 (2003), the jury verdict rendered Moon's argument regarding the grand jury's probable-cause determination moot.

## D.  Appellate Proceedings

Moon appealed the circuit court's Amended Judgment of Conviction and Sentence to the Intermediate Court of Appeals (ICA), and we later accepted transfer of this case.

On appeal, Moon first argues that the circuit court erred in holding that HRS § 327C-1 does not apply to criminal actions involving death, including his case and contends that arguments regarding defects in his indictment were not waived. Citing <u>State v. Przeradski</u>, 5 Haw. App. 29, 32, 677 P.2d 471, 474 (1984), Moon argues that by addressing the merits of his motion for arrest of judgment on the merits, the circuit court "impliedly granted relief from the waiver." Moon moreover argues that he did not file an untimely motion to dismiss the Indictment pursuant to HRPP Rule 12(b) (2018) (last amended in 2007), but rather, a timely motion to arrest judgment pursuant

to HRPP Rule 34 (1977).[15]  Moon argues that because HRPP Rule 34 states that the circuit court "shall arrest judgment if the charge does not allege an offense" (emphasis omitted), and because Counts 1 and 3 of the Indictment did not properly allege offenses, the circuit court had "no discretion" and was required to arrest his judgment.

Second, Moon argues that "the Circuit Court erred in denying Moon's motion to strike the testimony of Dr. Kobayashi for failure to produce the medical records upon which he relied in forming his opinion"[16]  Moon argues that under HRE Rule 705,[17] Dr. Kobayashi should have disclosed the facts or data underlying his opinion in discovery or at trial, and the circuit court abused its discretion by denying Moon's motion to strike on that ground.

---

[15]     HRPP Rule 34 provides that a "motion in arrest of judgment shall be made within 10 days after verdict or finding of guilty."  Moon's verdict was rendered on September 19, 2018, and he filed his motion nine days later on September 28, 2018.

[16]     At trial, Moon objected to testimony by Dr. Kobayashi "regarding anything that happened at the QMC" on the ground that Feliciano's medical records from QMC were never provided in discovery, in violation of Hawaiʻi Rules of Evidence (HRE) Rule 705 (2018) (last amended in 1984) and HRPP Rule 16 (2012).  The circuit court overruled the objection.

[17]     HRE Rule 705 provides:

> Rule 705. Disclosure of facts or data underlying expert opinion
> The expert may testify in terms of opinion or inference and give the expert's reasons therefor without disclosing the underlying facts or data if the underlying facts or data have been disclosed in discovery proceedings.  The expert may in any event be required to disclose the underlying facts or data on cross-examination.

Third, Moon argues that the circuit court committed plain error by failing to instruct the jury on the issue of causation, specifically "regarding intermediate intervening cause of death as set forth in HRS §§ 702-214, 215 and 216." "[E]ven though Dr. Kobayashi testified that the cause of death was the gunshot wound, it was still a jury question as to whether the removal of Decedent's organs was an independent intervening cause of death. The jury should have been instructed accordingly."

Fourth, Moon argues that he was denied his constitutional right to trial by jury when four potential jurors of Korean ancestry were excused.

Fifth, Moon argues that the circuit court's <u>Tachibana</u> colloquy[18] was deficient because the court failed to ascertain whether the defendant's waiver was voluntary.

Finally, Moon argues that "[d]efense counsel provided ineffective assistance of counsel by conceding in opening statement that Moon was the shooter" and waiving the potential defense "that Moon was not the person who shot [Feliciano]."

For the foregoing reasons, Moon requests his convictions on Counts 1 and 3 be reversed, or in the alternative,

_____

[18]     <u>Tachibana v. State</u>, 79 Hawai'i 226, 236, 900 P.2d 1293, 1303 (1995), established the requirement that when a defendant in a criminal case indicates an intention not to testify, the trial court "must advise criminal defendants of their right to testify and must obtain an on-the-record waiver of that right."

that his conviction on these counts be vacated and the case remanded for a new trial.

### III. STANDARDS OF REVIEW

#### A.    Statutory Interpretation

"Questions of statutory interpretation are questions of law to be reviewed de novo under the right/wrong standard." Nakamoto v. Kawauchi, 142 Hawai'i 259, 268, 418 P.3d 600, 609 (2018) (quoting Lingle v. Haw. Gov't Emps. Ass'n, AFSCME, Loc. 152, AFL-CIO, 107 Hawai'i 178, 183, 111 P.3d 587, 592 (2005)).

#### B.    Motion for Judgment of Acquittal

> When reviewing a motion for judgment of acquittal, we employ the same standard that a trial court applies to such a motion, namely, whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, the evidence is sufficient to support a prima facie case so that a reasonable mind might fairly conclude guilt beyond a reasonable doubt. State v. Pone, 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995); State v. Alston, 75 Haw. 517, 528, 865 P.2d 157, 164 (1994); State v. Rocker, 52 Haw. 336, 346, 475 P.2d 684, 690 (1970). Sufficient evidence to support a prima facie case requires "substantial evidence" as to every material element of the offense charged. State v. Eastman, 81 Hawai'i 131, 135, 913 P.2d 57, 61 (1996). "Substantial evidence" as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion. Id. Under such a review, we give "full play to the right of the fact finder to determine credibility, weigh the evidence, and draw justifiable inferences of fact." State v. Yabusaki, 58 Haw. 404, 410, 570 P.2d 844, 848 (1977).

State v. Jhun, 83 Hawai'i 472, 481, 927 P.2d 1355, 1364 (1996).

#### C.    Motion for Arrest of Judgment

"A motion in arrest of judgment must be made before the judgment is entered." Kerr v. Martin, 7 Haw. 645, 650 (Haw.

18

Kingdom 1889).

## IV.  DISCUSSION

**A.   HRS § 327C-1 Does Not Apply to All Criminal Cases Involving Death**

We first consider whether HRS § 327C-1 applies to this case, a matter of statutory interpretation.  We conclude that it does not.

"[T]he fundamental starting point for statutory interpretation is the language of the statute itself."  State v. Wheeler, 121 Hawai'i 383, 390, 219 P.3d 1170, 1177 (2009) (quoting Citizens Against Reckless Dev. v. Zoning Bd. of Appeals of Honolulu, 114 Hawai'i 184, 193, 159 P.3d 143, 152 (2007)). When interpreting a statute, "our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself."  Nakamoto, 142 Hawai'i at 268, 418 P.3d at 609 (quoting Lingle, 107 Hawai'i at 183, 111 P.3d at 592). "Nevertheless, statutory language is read 'in the context of the entire statute' and interpreted 'in a manner consistent with its purpose.'"  State v. Abella, 145 Hawai'i 541, 552, 454 P.3d 482, 493 (2019) (quoting State v. Haugen, 104 Hawai'i 71, 76, 85 P.3d 178, 183 (2004)).  To determine this purpose, "we are not limited to the words of the statute to discern the underlying policy which the legislature seeks to promulgate but may look to

19

[the] relevant legislative history." State v. Wells, 78 Hawaiʻi 373, 376, 894 P.2d 70, 73 (1995) (brackets and ellipsis omitted) (quoting Sol v. AIG Haw. Ins. Co., 76 Hawaiʻi 304, 307, 875 P.2d 921, 924 (1994)).

Moon argues that the circuit court erred in ruling that HRS § 327C-1 does not apply to criminal actions in which death constitutes the result element of the offense, like the grand jury proceeding in his case. Moon bases his argument on the language of HRS § 327C-1(d), which he argues, "plain[ly] and unambiguous[ly]" states that the statute applies to "[a]ll death determinations" for "all purposes, including . . . criminal actions, any laws to the contrary notwithstanding." (Emphasis omitted.) Since this case is a "criminal action" involving death, he argues that the requirements of HRS § 327C-1 apply, and these requirements were not met here.

We disagree. Under the plain language of HRS § 327C-1, specifically the title and subsection (d), this statute applies to "[d]etermination[s] of death" or "death determinations." While these terms, viewed in isolation, could apply to all criminal cases involving death, when viewed in context, it is clear they are terms of art intended to apply to more limited circumstances where the exact time or occurrence of death is necessarily at issue or undetermined.

HRS § 327C-1,[19] titled "Determination of death," sets

---

[19]     Quoted in full, HRS § 327C-1 provides:

(a) Except as provided in subsection (b), a person <u>shall be considered dead</u> if, in the announced opinion of a physician or osteopathic physician licensed under part I of chapter 453, physician or osteopathic physician excepted from licensure by section 453-2(b)(3), physician assistant licensed under chapter 453, or registered nurse licensed under chapter 457, based on ordinary standards of current medical practice, the person has experienced irreversible cessation of spontaneous respiratory and circulatory functions. <u>Death will have occurred</u> at the time when the irreversible cessation of the functions first coincided.

(b) In the event that artificial means of support preclude a determination that respiratory and circulatory functions have ceased, a person <u>shall be considered dead</u> if, in the opinion of an attending physician or osteopathic physician licensed under part I of chapter 453, or attending physician or osteopathic physician excepted from licensure by section 453-2(b)(3), and of a consulting physician or osteopathic physician licensed under part I of chapter 453, or consulting physician or osteopathic physician excepted from licensure by section 453-2(b)(3), based on ordinary standards of current medical practice, the person has experienced irreversible cessation of all functions of the entire brain, including the brain stem.  The opinions of the physicians or osteopathic physicians shall be evidenced by signed statements.  Death will have occurred at the time when the irreversible cessation of all functions of the entire brain, including the brain stem, first occurred.  Death shall be pronounced before artificial means of support are withdrawn and before any vital organ is removed for purposes of transplantation.

(c) When a part of a donor is used for direct organ transplantation under chapter 327, and the donor's death is established by determining that the donor experienced irreversible cessation of all functions of the entire brain, including the brain stem, the determination shall only be made under subsection (b).  The <u>determination of death</u> in all other cases shall be made under subsection (a).  The physicians or osteopathic physicians making the determination of death shall not participate in the procedures for removing or transplanting a part, or in the care of any recipient.

(d) <u>All death determinations</u> in the State shall be made pursuant to this section and shall apply <u>to all purposes</u>, including but not limited to civil and criminal actions, any laws to the contrary

(. . . continued)

forth the procedural requirements to be followed by physicians and other medical providers in making "death determinations," particularly in cases where the patient is on life support or the patient's organs are being prepared for transplantation. See HRS §§ 327C-1(b)-(d).  While subsection (a) provides the procedure applicable in most situations where a "death determination" is required, see HRS § 327C-1(a), subsection (b) sets forth a more detailed process that applies in cases where "artificial means of support preclude a determination that respiratory and circulatory functions have ceased," HRS § 327C-1(b).[20]  Notably, HRS § 327C-1 makes no reference to the HPC, which was enacted six years earlier in 1972.  Neither does

---

(. . . continued)

> notwithstanding; provided that presumptive deaths under the Uniform Probate Code shall not be affected by this section.
>
> (e) The director of health may convene in every odd-numbered year, a committee which shall be composed of representatives of appropriate general and specialized medical professional organizations, licensed attorneys, and members of the public.  The committee shall review medical practice, legal developments, and other appropriate matters to determine the continuing viability of this section, and shall submit a report of its findings and recommendations to the legislature, prior to the convening of the regular session held in each even-numbered year.

(Emphasis added.)

[20]     The latter requires written opinions by two physicians or osteopathic physicians that the person at issue "has experienced irreversible cessation of all functions of the entire brain, including the brain stem." HRS § 327C-1(b).  And, it provides that "[d]eath shall be pronounced before artificial means of support are withdrawn and before any vital organ is removed for purposes of transplantation."  Id.

the HPC cross-reference HRS § 327C-1. Since the HPC does not include a definition of death, death should be given its commonly understood meaning. See State v. Guess, 715 A.2d 643, 647-48 (Conn. 1998) (interpreting the definition of death "in accordance with its commonly approved usage," rather than applying the state's determination-of-death statute, "[b]ecause the legislature did not provide a definition of death in the Penal Code").

Moon nevertheless relies on subsection (d) of the statute, which provides that "[a]ll death determinations in the State shall be made pursuant to this section and shall apply to all purposes, including but not limited to civil and criminal actions, any laws to the contrary notwithstanding." HRS § 327C-1(d). Moon suggests that this means the procedure set forth in the statute applies whenever the fact of death needs to be established. But this interpretation ignores that the plain language of the statute, while defining the process for "death determinations," does not define death itself for all purposes. Indeed, neither subsections (a) nor (b) define the circumstances under which a person "is" dead; rather, they state the conditions under which a person "shall be considered" dead. HRS §§ 327C-1(a) and (b). Thus, while HRS § 327C-1 provides a way in which death can be established, it does not provide the only way in which the fact of death must be established.

23

This interpretation is supported by the legislature's use of the phrase "determination of death" in other statutes. For instance, "determination of death" is mentioned in HRS § 560:1-107 (1993),[21] which provides the "rules relating to a

---

[21]    HRS § 560:1-107 is entitled "Evidence of death or status" and states:

> In addition to the rules of evidence, the following rules relating to a <u>determination of death</u> and status apply:
> (1) Death occurs when an individual has sustained either:
>     (A)  Irreversible cessation of circulatory and respiratory functions; or
>     (B)  Irreversible cessation of all functions of the entire brain, including the brain stem. A <u>determination of death</u> must be made in accordance with accepted medical standards;
> (2) A certified or authenticated copy of a death certificate purporting to be issued by an official or agency of the place where the death purportedly occurred is prima facie evidence of the fact, place, date, and time of death and the identity of the decedent;
> (3) A certified or authenticated copy of any record or report of a governmental agency, domestic or foreign, that an individual is missing, detained, dead, or alive is prima facie evidence of the status and of the dates, circumstances, and places disclosed by the record or report;
> (4) In the absence of prima facie evidence of death under paragraph (2) or (3), the fact of death may be established by clear and convincing evidence, including circumstantial evidence;
> (5) An individual whose death is not established under the preceding paragraphs who is absent for a continuous period of five years, during which the individual has not been heard from, and whose absence is not satisfactorily explained after diligent search or inquiry, is presumed to be dead. The individual's death is presumed to have occurred at the end of the period unless there is sufficient evidence for determining that death occurred earlier;
> (6) In the absence of evidence disputing the time of death stated on a document described in paragraph (2) or (3), a document described in paragraph (2) or (3) that states a time of death one hundred twenty hours or more after the time of death of another individual, however the time of death of the other individual is determined,

(. . . continued)

24

determination of death and status" for probate matters under Hawai'i's Uniform Probate Code.  Relatedly, the Hawai'i Probate Rules (HPR) use the term "determination of death," when referring to "determination of death proceedings," which are conducted for missing persons.  See, e.g., HPR Rules 150-152, 154 (describing the commencement of action, notice, and order requirements for "Determination of Death Proceedings" for missing persons).

The term "determination of death" is also mentioned in HRS Chapter 327, entitled "Medical and Research Use of Bodies." HRS § 327-38 (2010) describes prohibitions and penalties for the disposition of dead human bodies, stating,

> "Dead human body" means:
>
> > (1) An individual who has sustained either irreversible cessation of circulatory and respiratory functions or irreversible cessation of all functions of the entire brain, including the brain stem; provided that the determination of death be made in accordance with accepted medical standards[.]

HRS § 327-38(e) (emphasis added).

The statute regarding "Requests for anatomical gifts" similarly states,

> Any person in charge of a hospital, or the designated representative of the person in charge of the hospital,

_____

(. . . continued)

> > establishes by clear and convincing evidence that the individual survived the other individual by one hundred twenty hours.

(Emphases added.)

> other than a person connected with the <u>determination of death</u>, may request any of the persons in section [327-9], in the order of priority stated, to give consent to the gift of all or any part of the decedent's body to any potential donee for any purpose provided in section [327-11].

HRS § 327-52 (2010) (emphasis added).

These examples, as well as HRS § 327C-1's placement under "Title 19. Health,"[22] demonstrate that the terms "determination of death" and "death determination" are not synonymous with the mere fact of death.  Rather, they hold a specific meaning that is applicable when the precise medical establishment of death is required.[23]

The legislative history and purpose of HRS § 327C-1 not only supports the foregoing interpretation, but also suggests that the statute was drafted to guide and protect health-care providers from civil or criminal liability.  The

---

[22]     Title 19 ("Health") ranges from HRS Chapter 321 ("Department of Health") to HRS Chapter 344 ("State Environmental Policy").  HRS Chapter 327C ("Death"), which houses HRS § 327C-1, follows HRS Chapter 327 ("Medical and Research Use of Bodies").  The latter includes the Revised Uniform Anatomical Gift Act, which regulates the responsibilities of health-care providers, medical examiners, and coroners in the acceptance and disposition of donated body parts.  HRS Chapter 327C is followed by HRS Chapters 327E ("Uniform Health-Care Decisions Act"), 327F ("Medical Treatment Decisions for Psychotic Disorders"), 327G ("Advance Mental Health Care Directives"), 327H ("Pain Patient's Bill of Rights"), 327K ("Provider Orders for Life-Sustaining Treatment"), and 327L ("Our Care, Our Choice Act").  HRS § 327C-1 thus appears within a series of health-related chapters that address the rights and duties of patients, decedents, and medical professionals; notably absent are provisions relating to criminal process or the rights of criminal defendants.

[23]     A precise medical determination of death may be required, for example, in certain probate cases, when using a body for medicine and research, or when an action is commenced while a person is still on life support.

Senate Judiciary Committee Report recommending the bill's passage notes that "there is no State statute which defines when a human being shall be pronounced dead," suggesting that the legislature intended to provide a procedure for the "determination of death" rather than a universally applicable means of proving death.  S. Stand. Comm. Rep. No. 617, in 1978 Senate Journal, at 1026 (emphasis added).  The same report states that the purpose of the bill is "to establish and provide a definition of the medical death of a human being," noting:

> Historically, there was no alternative to the traditional method of determining death.[24]  However, the increased sophistication and extension of medical knowledge in resuscitation, artificial life support techniques, and organ transplants now require a different means of measuring death.  The traditional criteria are no longer reliable in certain circumstances.

Id. (emphasis added).

HRS 327C-1 was thus directed at health care providers - particularly those involved in the process of determining whether organs may be removed from an individual for transplantation.  The specific procedure outlined in the statute was designed to be a safe harbor from civil or criminal liability.

Two years before the enactment of HRS § 327C-1 in 1978, the Senate passed S.R. No. 432, S.D. 1, calling on the

---

[24]    The LRB Report characterizes the "traditional" method of death determination as the "measure of circulatory-respiratory death."  LRB Report, supra p.3, at 5.

27

Legislative Reference Bureau (LRB) to study "statutorily defining and timing the death of a human being."  S. Stand. Comm. Rep. No. 1029, in 1976 Senate Journal, at 1272.  This request was made in recognition of "an impressive number of cases and an unprecedented amount of litigation" concerning "a legal definition of death."  The resulting report, entitled "Towards a Definition of Death," recognized that "the advent of modern medicine and development of extraordinary life sustaining techniques" created the need for a definition of death, "a previously non-existent problem."  LRB Report, supra p.3, at 1. After reviewing the legal and medical implications of a definition of death and surveying other states' statutes defining death, the report "recommend[ed] that the State of Hawaiʻi enact a statutory definition of death."[25]  Id. at 1-3.

There are several indications that the definition of death proposed by the LRB Report was meant to apply to a set of limited circumstances in which a determination of death is required.  The report began by discussing cases where the absence of a legal-death standard created uncertainty, noting that "[t]he current lack of agreement between medical practice and law has resulted in some legal entanglements, some of which

_____

[25]    The report proposed statutory text to that end.  LRB Report, supra p.3, at 116-18.  The proposed text was adopted almost word for word. See HRS § 327C-1 (1978).

resulted in judicial recognition of and acquiescence in the brain death standard."  Id. at 2.  After explaining that "[t]he relevance of a definition of death, or any need for such a definition is perhaps made most understandable when viewed in the light of well-publicized death issues," the report discussed two cases[26] - one involving a patient on life support, the other involving an organ donor[27] - "to clarify the definition of death as an issue."  Id. at 4.  Both cases highlighted the need for a statute that "determin[ed] at as nearly accurate a point in time as possible, the moment of death, or more precisely . . . the point at which a human body has progressed in the process of death when realistic medical assessment of condition is a finding of death."  See id. at 4.

---

[26]    The first case discussed in the LRB Report was the Quinlan case, in which New Jersey courts considered a petition from Karen Ann Quinlan's parents to remove her artificial respirator.  LRB Report, supra p.3, at 3-10, 119 n.1.  For over a year, Quinlan was in a vegetative state with her breathing artificially maintained after she allegedly took a lethal combination of tranquilizers and alcohol.  Id. at 4-5.  Medical test results, however, showed some brain rhythm, so she never met the requirements for brain-function death.  Id. at 5.  This court in Abella cited the Quinlan case, and described its influence on the development of the law in Hawaiʻi and nationally regarding a patient's "right to refuse further life-sustaining medical treatment."  Abella, 145 Hawaiʻi at 553, 454 P.3d at 494 (citing In re Quinlan, 355 A.2d 647 (N.J. 1976).
        The Cameron case took place in Hawaiʻi and concerned court proceedings regarding the removal of Alice Cameron's organs for donation.  LRB Report, supra p.3, at 10-14.  After an alleged drug overdose, Cameron "could not breathe without the assistance of the respirator" and was declared brain dead by her treating physician, despite disagreement among other physicians as to whether she was in fact dead.  Id. at 11-12.

[27]    These are precisely the circumstances discussed in HRS § 327C-1.  See HRS §§ 327C-1(b) and (c).

The LRB Report also identified specific areas in which the need for a statute defining death was particularly evident. The report listed three categories of legal cases where determinations of death previously arose: (1) property, inheritance, and insurance rights;[28] (2) missing persons;[29] and (3) homicide and wrongful death. Id. at 52-56. As to the latter, the report focused on issues of liability, discussing cases in which physicians who removed brain-dead patients from artificial life-support systems "exposed [themselves] to criminal liability for homicide, or civil liability for wrongful death, or both."[30]

---

[28] The LRB explained that litigation often arises in simultaneous death cases where the primary issue is the "question of survivorship" (e.g., determining whether a spouse died at the scene when her brain ceased to function or when she was removed from the respirator). LRB Report, supra p.3, at 52. Likewise, issues arise regarding insurance benefits when insurance companies set time limits for accidental death benefits (e.g., determining whether a spouse, who was kept alive on a respirator for more than ninety days after an accident, had "died" within an insurance policy's ninety-day time limit). Id. at 53. In such cases, "timing bears crucially on inheritance rights." Id.

[29] In missing persons cases, the LRB explained that the law determines "the period of time which must elapse" for a "presumptive determination[] of death," specifically for "distributing the person's property or freeing a spouse to remarry . . . ." LRB Report, supra p.3, at 53-54. The LRB noted that in Hawai'i this period of time is five years per the Uniform Probate Code. Id. at 54.

[30] The LRB Report describes Tucker's Administrator v. Lower, in which the brother of a transplant donor sued the surgeons who removed his brother's organs for the wrongful death of the donor. LRB Report, supra p.3, at 54, 124 n.12. The report noted that, in this case, "the primary issue was the determination of the time of death," specifically, whether the donor was dead at the time the surgeons removed his organs. Id. at 54. The LRB Report also describes Regina v. Potter, in which a court reduced a defendant's charge from murder to assault, finding that the "intervening acts of the physicians" – specifically, terminating the artificial life support of the brain-dead patient - "mitigated the original charge." Id. at 30-31, 55; cf. Abella, 145 Hawai'i at 559, 454 P.3d at 500 (rejecting the argument that "removal of life support cannot constitute an intervening cause that may

(. . . continued)

30

Id. at 54.  Where a person accuses a doctor of homicide or
wrongful death for the removal of life support, the LRB noted,
both timing and causation are at issue.  Id. at 55.  In such
cases, the report implied, a medical determination of death may
be warranted.

Other jurisdictions have similarly held that death-
determination statutes are not applicable to every case
involving death.  In State v. Edwards, 767 N.W.2d 784, 800 (Neb.
2009), the Nebraska Supreme Court held that their determination-
of-death statute did not apply to homicide cases where the body
of the decedent was missing.  There, following a jury trial, the
defendant was convicted of Murder in the Second Degree and Use
of a Deadly Weapon to Commit a Felony.  Id. at 795.  The
decedent was last seen leaving her apartment for the defendant's
apartment.  Id. at 792.  While her body was never recovered, the
decedent's blood was found in the defendant's bedroom, on the
mattress and walls, on a weapon in his closet, and in the trunk
of his car.  Id. at 793-94.  The defendant argued that, inter
alia, the State failed to prove the decedent's death under

---

(. . . continued)

absolve a defendant from liability for causing death").  The LRB noted, in
addition to the issue of causation, that "[t]he question of timing of death
in view of physician intervention" was necessarily at issue in Regina.  LRB
Report, supra p.3, at 55.  Thus, both Tucker's Administrator and Regina
illustrated that, in certain cases, the precise timing of a person's death
could have legal implications and could be determined using the procedures
set forth in HRS § 327C-1.

Nebraska's determination-of-death statute[31] and the court should have instructed the jury on this statute. Id. at 798-99.

The Nebraska Supreme Court rejected both arguments, finding the statute inapplicable. Id. at 798, 800. The court explained, "We do not read the [statute] as establishing a rule of evidence requiring that in all cases involving an alleged decedent, the fact of death must be medically established." Id. at 800. Rather, the statute applies to certain cases involving death determinations: "[T]here may be cases in which the [statute's] medical standards are implicated, when there is a question as to the cause or time of an alleged death, or where there is conflicting medical evidence about the alleged decedent's condition." Id. As there were no such questions or evidence in this case, the court applied the standard of death recognized under Nebraska's common law – proof of death by circumstantial evidence – and concluded that the evidence at trial was sufficient to prove the decedent's death. Id.

---

[31] Nebraska's statute, entitled "Determination of death," falls under "Chapter 71. Public Health & Welfare" and states the following:

> Only an individual who has sustained either (1) irreversible cessation of circulatory and respiratory functions, or (2) irreversible cessation of all functions of the entire brain, including the brain stem, is dead. A determination of death must be made in accordance with accepted medical standards.

Neb. Rev. Stat. § 71-7202 (1992).

32

We likewise hold that HRS § 327C-1 applies only in certain criminal cases that involve "death determinations." Most notably, in cases where a physician is charged with a crime for removing a patient from life support, the physician can fulfill the requirements of this statute to prove the patient was dead before the removal of such support. But not all criminal cases involving death require such death determinations. In most criminal cases, the fact and time of death are not contested – in those cases, all would agree the decedent died, so HRS § 327C-1 does not apply.

To hold otherwise would be to disregard well-accepted canons of statutory construction. Generally, statutes should be construed "to avoid, if possible, inconsistency, contradiction, and illogicality." Abella, 145 Hawaiʻi at 552, 454 P.3d at 493 (quoting Haugen, 104 Hawaiʻi at 76, 85 P.3d at 183). "If a literal construction of statutory language would produce an absurd result, we presume that result was not intended and construe the statute in accord with its underlying legislative intent." Id. (citing Haugen, 104 Hawaiʻi at 77, 85 P.3d at 184). The interpretation of HRS § 327C-1 advanced by Moon here would produce absurd results. Most notably, in cases in which someone is abducted, murdered, and the body is disposed of, there would be no way for a health care provider to make the required determination, and the State could never make the required

showing that the defendant had caused the death of another.[32]

        With these principles in mind, we turn to the facts of this case.

**B.    The State Was Not Required to Meet the Requirements of HRS § 327C-1 to Prove Feliciano's Death**

        At trial, various witnesses testified that Moon shot Feliciano in the head during an altercation.  Inoue testified that Dr. Nakagawa pronounced Feliciano dead on December 28, 2016.  Feliciano's organs and tissues were subsequently removed on December 30, 2016.  Dr. Kobayashi then performed an autopsy on Feliciano on January 3, 2017 and determined that the cause of Feliciano's death was a gunshot wound to the head.  No evidence was presented to contradict this testimony.  Thus, at the time of Moon's trial, there was no need for a "determination of death" within the meaning of HRS § 327C-1.  There was no disagreement that Feliciano was dead at that point, and HRS § 327C-1 did not apply.  Viewing the evidence at trial "in the light most favorable to the prosecution and in full recognition of the province of the trier of fact," there was substantial evidence to support the material element of death in this case. See Jhun, 83 Hawai'i at 481, 927 P.2d at 1364.

_____

        [32]    HRS § 327C-1(c) specifically provides that "[t]he determination of death in all other cases shall be made under subsection (a)."  (Emphasis added.)  Read literally, this would mean that there could be no determination of death in cases in which there is no body – an absurd result.

Moon additionally argues that HRS § 327C-1 applied to the grand jury proceeding, since Feliciano was "being kept alive by artificial means" at that time.  However, Moon did not challenge the indictment before trial.  Rather, he challenged it through a motion for arrest of judgment, arguing that the "one physician who declared [Feliciano] 'brain dead' . . . [was] not sufficient to prove that [Feliciano] was legally dead as required by the statute."[33]  According to Moon, "[w]ithout sufficient evidence to support the murder charge, the indictment is defective on that count."  He also argues that the indictment failed to allege an offense and/or the circuit court lacked jurisdiction of the offense, and his motion therefore should have been granted.

Moon essentially challenges the sufficiency of the evidence to support his indictment, specifically the grand jury's probable-cause determination for the element of death.

---

[33]    A motion for arrest of judgment was not an appropriate motion for this argument.  A motion for arrest of judgment is meant "to give the trial judge another chance to invalidate a judgment due to a fundamental error appearing on the face of the record."  3 Charles Alan Wright et al., Federal Practice & Procedure § 601 (5th ed. 2022) (emphasis added) (examining Fed. R. Crim. P. 34, which is the federal equivalent of HRPP Rule 34).  The "record" includes the indictment itself but not evidence; thus, "[a]n attack on the sufficiency of the evidence" is not appropriate for a motion for arrest of judgment.  Id.; see also Territory v. Anderson, 23 Haw. 347, 348 (Haw. Terr. 1916) (per curiam) ("The motion in arrest [of judgment] reaches substantial errors which are patent on the record, and which vitiate the proceedings . . . .  The objection that the verdict is contrary to the evidence or based on insufficient evidence . . . cannot be urged in arrest of judgment."  (quoting 12 Cyclopedia of Law & Procedure 756, 759 (William Mack ed., 12th ed. 1904))).

However, under HRPP Rule 12(b)(2), "objections based on defects in the charge" "must be raised prior to trial[.]" A party's failure to raise such objections "shall constitute waiver thereof, but the court for cause shown may grant relief from the waiver."[34] HRPP Rule 12(f). Moon argues that the circuit court "impliedly granted relief from the waiver" by "address[ing] the merits of the motion and den[ying] it," citing Przeradski, 5 Haw. App. at 32, 677 P.2d at 474. In Przeradski, the defendant failed to raise a HRPP Rule 12(b)(3) motion to suppress evidence before trial as required under HRPP Rule 12(f). Id. at 31-32, 667 P.3d at 474. "[W]ithout comment, the trial court heard argument on the merits from both sides, and, thereafter, denied the motion." Id. at 32, 667 P.3d at 474. Based on these actions, the ICA held that "the trial court impliedly

_____

[34] We have allowed parties to challenge indictments for the first time on appeal, but such parties have argued that their indictments failed to charge an offense; they did not solely challenge the sufficiency of the evidence supporting probable cause. See, e.g., State v. Tominiko, 126 Hawai'i 68, 75, 266 P.3d 1122, 1129 (2011) (addressing defendant's argument that "the charge cannot be construed to charge an offense"); State v. Merino, 81 Hawai'i 198, 211, 915 P.2d 672, 685 (1996) (addressing defendant's argument that "the charging complaint was fatally defective in that it 'fail[ed] to sufficiently allege the elements of conspiracy'" (alteration in original)). We have permitted such challenges because, pursuant to HRPP Rule 12(b)(2), "defenses and objections based on defects in the charge" "must be raised prior to trial" unless the challenge is "that it fails to show jurisdiction in the court or to charge an offense." (Emphasis added.) HRPP Rule 12(b)(2) states that such challenges regarding jurisdiction or charging an offense "shall be noticed by the court at any time during the pendency of the proceedings." HRPP Rule 12(b)(2) (emphasis added); Merino, 81 Hawai'i at 211, 915 P.2d at 685. Although framed as a challenge that the indictment failed to allege an offense (or that the court lacked jurisdiction), as noted above, Moon is challenging the sufficiency of the evidence to establish probable cause.

granted . . . relief [from the waiver]" under HRPP Rule 12(f) and that the motion was properly before the ICA.  Id. at 32, 667 P.3d at 474.

In contrast, the circuit court here specifically found that the motion was untimely and that Moon had failed to establish good cause.  Thus, notwithstanding this court's discretion to review a defendant's untimely motion, here, we decline to do so.[35]  As mentioned above, the State in this case developed evidence at trial that supported a finding beyond a reasonable doubt that Moon committed Murder in the Second Degree; this included evidence of death.  On these facts, Moon's objection to the sufficiency of evidence supporting the indictment, made in a post-judgment motion for arrest of judgment, was untimely and thus waived.

Relatedly, Moon, citing In re Doe, 102 Hawai'i at 78, 73 P.3d at 32, argues that his case is not moot because it concerns "unusual circumstances.[36]  Moon argues that if he had moved to dismiss the indictment before trial, the State would

---

[35]  Contrary to Moon's contention, Przeradski does not hold that appellate courts must review untimely motions.  See Schutter v. Soong, 76 Hawai'i 187, 204, 873 P.2d 66, 83 (1994) (citing Przeradski for the proposition that the defendant's "failure to file a timely motion will not be deemed a waiver of his right to seek disqualification, and [this court] may review the decision of the lower court" (emphasis added)).

[36]  In In re Doe, the court held that "absent unusual circumstances, any defects in a pretrial determination of probable cause are rendered moot, or are without any effective remedy, which is much the same thing, by a subsequent conviction[.]"  102 Hawai'i at 78, 73 P.3d at 32 (footnote omitted).

not have been able to present evidence that Feliciano had experienced "irreversible cessation of all functions of the entire brain, including the brain stem," at the grand jury proceeding because HRS § 327C-1(b) requires that determination to be made by two physicians independently.  HRS § 327C-1(b).

According to Moon, the State would not have been able to present evidence of brain death even if a second grand jury was convened after the organ-donation procedure because "by that time, Feliciano's organs had all been removed.  He was dead but, because the statutory procedure had not been followed, there was no way to legally prove that he might have recovered from his loss of brain function."  Moon's arguments are unavailing.  If Moon had succeeded in moving to dismiss pretrial based on the State's failure to establish probable cause on the element of death as he suggests, the State could have returned to the grand jury several days later, after Feliciano's organs had been removed.[37]  At that point, no one would have disagreed that Feliciano was dead, and the State would not have needed to present evidence that Feliciano had experienced irreversible cessation of brain function.

---

[37]    Feliciano's organs and tissues were removed two days after the grand jury indictment.

## C.    Moon's Other Arguments Lack Merit

Moon's remaining arguments on appeal are unavailing. First, the circuit court did not err in denying Moon's motion to strike Dr. Kobayashi's testimony at trial.  HRE Rule 705 provides as follows:

> Rule 705 Disclosure of facts or data underlying expert opinion.  The expert may testify in terms of opinion or inference and give the expert's reasons therefor without disclosing the underlying facts or data if the underlying facts or data have been disclosed in discovery proceedings. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

In this case, the "underlying facts or data" supporting Dr. Kobayashi's testimony were disclosed in discovery in the form of an autopsy report that was provided to the defense.[38]  HRE Rule 705.  This autopsy report satisfied the disclosure requirement because, as the circuit court found in its order denying Moon's motion to dismiss with prejudice based on the State's failure to disclose medical records from QMC, it "included . . . all relevant information that he gleaned from the [QMC] medical records."  Therefore, the QMC records did not need to be separately produced.[39]  Since there was no violation

---

[38]    The autopsy report referenced the QMC medical records as a component of Moon's "[r]ecent medical history."

[39]    To obtain the QMC medical records, Moon could have sought to subpoena them from QMC.  As noted by the circuit court, "[n]othing precluded the defense from issuing [a subpoena duces tecum] on August 6, 2018 [when Moon first requested the QMC medical records from the State], or soon thereafter, requesting the production of Mr. Feliciano's records from the QMC."

of HRE Rule 705 here, the circuit court did not err in denying Moon's motion to strike Dr. Kobayashi's testimony.[40]

Second, the circuit court did not commit plain error by failing to instruct the jury on the issue of causation. Citing Abella, 145 Hawai'i at 560-61, 454 P.3d at 501-02, Moon argues that the circuit court should have instructed the jury on whether the removal of Feliciano's organs was an independent intervening cause of death. Abella is inapplicable to the facts of this case. Unlike in Abella, where the defendant could point to several volitional acts, including surgery and the removal of medical support, as potential intervening causes, 145 Hawai'i at 558, 454 P.3d at 499, here, Moon neither identifies any medical procedures that could have contributed to Feliciano's death, nor argues that Feliciano's death was related to the removal of medical support. Rather, Moon contends that removal of Feliciano's organs, which occurred after Feliciano's death, could have been considered an intervening cause of death. We find this argument unavailing and hold that the circuit court did not err by not instructing the jury on the issue of

---

[40] Even if a violation of HRE Rule 705 occurred, the circuit court's refusal to strike Dr. Kobayashi's testimony appears harmless beyond a reasonable doubt. Moon presents no evidence on appeal of a "reasonable possibility that the error contributed to [Moon's] conviction." State v. Nichols, 111 Hawai'i 327, 329, 141 P.3d 974, 976 (2006).

causation pursuant to HRS §§ 702-214 (2014), 215 (2014), and 216 (2014).

Third, Moon's constitutional right to trial by jury was not violated by the excusal of four potential jurors of Korean ancestry. The circuit court properly considered the State's race-neutral justifications for its peremptory challenges and found "no evidence that the State exercised its peremptory challenges to exclude Korean jurors on the basis of the juror's [sic] race."[41] Upon reviewing the record, we agree that the defendant failed, upon hearing the State's race-neutral explanations, to prove the State had committed purposeful discrimination. See State v. Daniels, 109 Hawai'i 1, 6, 122 P.3d 796, 801 (2005) (holding that "if a category-neutral explanation [for a peremptory challenge] is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful discrimination"). In this regard, the circuit court did not err.

Fourth, the circuit court's Tachibana colloquy was not deficient. The record establishes that the court engaged in a true colloquy with Moon, demonstrating that he understood that he had a constitutional right to testify, that no one could

---

[41] Although listed under the heading "Conclusions of Law," the circuit court's statement regarding the absence of evidence of the State's racial motive was a finding of fact, not a conclusion of law.

prevent him from testifying, that if he chose to testify, the prosecutor would be allowed to cross-examine him, and that the decision to testify was his.  Under these circumstances, the circuit court did not err in concluding that Moon's waiver of the right to testify was voluntary.

Finally, Moon's ineffective assistance of counsel claim lacks merit.  Given the strength and amount of evidence supporting that Moon shot Feliciano, defense counsel's concession in opening statement that Moon was the shooter was plausibly tactical.  See Briones v. State, 74 Haw. 442, 444, 848 P.2d 966, 969 (1993) ("Specific actions or omissions alleged to be error but which had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny."); cf. Florida v. Nixon, 543 U.S. 175, 176, (2004) (holding defense counsel's failure to obtain defendant's express consent to a strategy of conceding guilt did not automatically render counsel's performance deficient).  We therefore reject Moon's ineffective assistance of counsel claim.

## V. CONCLUSION

For the foregoing reasons, we affirm the circuit court's October 3, 2019 Amended Judgment of Conviction and Sentence.

| | |
|---|---|
| Emmanuel G. Guerrero<br>for appellant | /s/ Mark E. Recktenwald |
| | /s/ Paula A. Nakayama |
| Chad M. Kumagai<br>for appellee | /s/ Sabrina S. McKenna |
| | /s/ Todd W. Eddins |

